NOT FOR PUBLICATION

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

_____
                                        :
STEPHEN J. BENSON,                      :
                                        :   Civil Action No. 13-0213 (RMB)
          Petitioner,                   :
                                        :
          v.                            :         **OPINION**
                                        :
UNITED STATES OF AMERICA,               :
et al.,                                 :
                                        :
          Respondents.                  :
_____ :

This matter comes before the Court upon Petitioner's submission of a § 2241 petition, which arrived unaccompanied by his filing fee of $5 or by his in forma pauperis application. See Docket Entry No. 1.[1]

I.   BACKGROUND

Petitioner is a federal inmate confined at the FCI Fairton ("Fairton"), New Jersey. Underlying Petitioner's challenges is a disciplinary sanction imposed on the basis of an incident that took place at the Fairton library on February 25, 2012. See Docket Entry No. 1, at 21. That incident gave rise to an incident report produced by Officer K. Conception ("reporting officer") who witnessed the incident. See id. The report read:

> Saturday February 25, 2012, at 10:25 AM, I was in the
> Education Department Leisure Library. I looked up from
> my table [and saw Petitioner] seated at the middle

---

[1] Petitioner followed his submission by a series of exhibits, see Docket Entry No. 2, but none of them was his in forma pauperis application. See id.

table, staring at me.  It was at this time I realized
[Petitioner] was masturbating.  Specifically, he was
seated with his pants pulled down lower than
appropriate, with his penis out and in his hands,
massaging it.  I ordered [Petitioner] to stop what he
was doing [and] radioed to [the supervising Officers]
asking them to report to [the library].  When they
arrived, [Petitioner] was removed . . . .

Id.

Later on the date of the incident, at 8:05 PM, Petitioner

was served with the notice of the disciplinary charges against

him (based on said incident).  See id. at 37.  In response, he

made an oral statement and, in addition, executed a written

statement.  See id.  In those statements, he indicated that the

incident report "was partially true" since he stated: "'I was

sitting at the table with my hands [dipped] in[to] my pants.

[Since] I have psoriasis over most of my body [including my

genitals,] I was scratching myself [in the genital area]."  Id.

Petitioner, however, denied exposing his penis.  See id.

Petitioner had his disciplinary hearing on March 8, 2012,

i.e., ten days after the incident.  See id.  He waived his right

to request a staff representative.  See id.  Rather,

[Petitioner] requested [an opportunity to call as his
defense witnesses] the inmates that were sitting at his
table in [the library] at the time of the incident.
[Petitioner] stated he did not know the identity of the
inmates at the table with him, but indicated they were
Jamaican.  [The hearing officer] informed [Petitioner]
that[,] without proper identification[, the hearing
officer] would not know who to call as a witness.
[Petitioner] also [requested to] call[] Dr. Morales as
a witness [asserting that] Dr. Morales would testify
that [Petitioner] ha[d] psoriasis over a large portion

of his body [including his genital area. The hearing
officer] informed [Petitioner] that neither the
existence nor extent of [Petitioner's] psoriasis [was]
disputed [since the hearing officer] accept[ed
Petitioner's] assertion that he ha[d] psoriasis over a
large portion of his body. Therefore, Dr. Morales was
not called [as Petitioner's] witness because [the
hearing officer found that Dr. Morales'] testimony
would be [duplicative and superfluous].

Id. at 38.

Petitioner's disciplinary hearing produced the sanctions he

is challenging here. The bases for these sanctions were

explained to him in a disciplinary finding reading as follows:

[The hearing officer] finds [that Petitioner] committed
the prohibited act of Engaging in Sexual Acts, Code
205, when [Petitioner] you took part in intimate
physical contact with [him]self by exposing and rubbing
[his] penis in view of staff. . . . [Petitioner made
an] admission that the reporting officer observed
[Petitioner] with [his] hands [deepened into his]
pants. [Petitioner] admits having [his] hands in [his]
pants but den[ies] any wrong[]doing [on the grounds]
that [he has] psoriasis and [he] had [his] hands in
[his] pants to scratch [him]self. [The hearing officer]
took into consideration [that] statement but gave
little weight to [Petitioner's] defense. [Petitioner's]
version of events is unreasonable . . . . It is
reasonable to believe that[,] if a person had an itch
of that nature and degree[, that person] would have
went to the restroom to appropriately address the
issue. [Petitioner] did not [do that]. [Therefore, the
hearing officer] finds the reporting officer's account
more reasonable to believe and gives more weight to her
testimony. [Petitioner is sanctioned to] disallow[ance
of] good conduct time [in the amount of] 27 days.

Id. at 38-39.[2]

_____

[2]  The Bureau of Prison ("BOP") "Handbook" distributed to
all inmates upon their admission to a federal correctional
facility notifies the inmates that, inter alia, "Inmates who
engage in inappropriate sexual behavior can be charged with [for

3

II.  IN FORMA PAUPERIS

Section 1914 provides that "[t]he [C]lerk of each district court shall require the parties instituting any civil action, suit or proceeding in such court . . . to pay a filing fee of $ 350 except that on application for a writ of habeas corpus the filing fee shall be $ 5."  42 U.S.C. § 1914(a).  The Supreme Court, however, observed that, "while [$ 5] is . . . an 'extremely nominal' sum, if one does not have it and is unable to get it[,] the fee might as well be [$ 500]."  Smith v. Bennett, 365 U.S. 708, 712 (1961).  Therefore, a related statute, Section 1915, governs applications filed in forma pauperis and provides, in relevant part, that leave to proceed in forma pauperis may be granted in any suit to a litigant "who submits an affidavit [which demonstrates] that the [litigant] is unable to pay such fees or give security therefor."  28 U.S.C. § 1915(a)(1).[3]

---

instance, a violation of] Code 205/(A): Engaging in a Sex Act."
http://www.bop.gov/locations/institutions/eng/ENG_fdc_aohandbook.
pdf, at *6.

[3] Specifically, in a habeas matter, the prisoner seeking to proceed in forma pauperis must submit to the Clerk: (a) a completed affidavit of poverty; and (b) a certification signed by an authorized officer of the institution certifying both the amount presently on deposit in the petitioner's prison account as well as the greatest amount on deposit in the petitioner's prison account during the six month period prior to the date of the certification.  See Local Civil Rule 81.2(b).  Consequently, to submit an application to proceed in forma pauperis in a habeas case, the prisoner must: (a) complete all questions in his/her affidavit, sign and date that affidavit; and (b) obtain the signature of the appropriate prison official who certifying the prisoner's present and the greatest six-month amounts.  See id.

4

The prisoner's legal obligation to prepay the filing fee or to duly obtain in forma pauperis status is automatically incurred by the very act of initiation of his legal action. See Hairston v. Gronolsky, 2009 U.S. App. LEXIS 22770, at *5 (3d Cir. Oct. 15, 2009) (citing Hall v. Stone, 170 F.3d 706, 707 (7th Cir. 1999)). If the application to proceed in forma pauperis is incomplete, the Court may enter an order denying the application without prejudice and administratively terminating the case.

Here, Petitioner failed to submit his affidavit of poverty and a certified prison account statement. Therefore, his application to proceed in this matter in forma pauperis, if such was implied in his submission, will be denied, without prejudice. He will be directed to timely submit his $5 filing fee or his complete in forma pauperis application.

III. ANALYSIS

A. Petitioner's Position

Here, Petitioner is challenging loss of his good-conduct-time ("GCT") credits. He asserts that his due process rights were violated because: (a) he was not allowed to call Dr. Morales to testify that he had psoriasis, including in his genital area; (b) the hearing officer did not assist him in obtaining the names of the three inmates whom Petitioner identified merely as "Jamaican"; (c) he believes that the hearing officer was biased against him; (d) the hearing officer found the incident report

executed by the reporting officer more credible than Petitioner's

position; (e) the hearing officer's final findings report was

dated April 11, 2012, but delivered to Petitioner three days

later (and about a month after Petitioner's disciplinary

hearing); and (f) Petitioner allegedly experienced certain

obstacles while he was exhausting his claims administratively,

although he maintains that his administrative exhaustion process

was duly completed.[4]  See generally, Docket Entry No. 1.

　　B.　　Governing Legal Tests

While convicted prisoners retain the protections of the Due

Process Clause of the Fifth and Fourteenth Amendments that the

government may not deprive them of life, liberty, or property

without due process of law, see Wolff v. McDonnell, 418 U.S. 539,

556 (1974); Haines v. Kerner, 404 U.S. 519 (1972), these

protections are "subject to restrictions imposed by the nature of

the regime to which [prisoners] have been lawfully committed."

Wolff, 418 U.S. at 556.

A liberty interest protected by the Due Process Clause may

arise from either of two sources: the Due Process Clause itself

---

[4]  In addition, Petitioner asserted that, had he been
provided with a certain "30 Inmate Out-Count sheet," he could
have figured out "the last names of [the] three witnesses" whom
he identified to the hearing officer as merely "Jamaican."  Id.
at 9.  While the Petition is less than clear as to this issue,
some statements made therein could be construed as suggesting
that Petitioner might have requested this "30 Inmate Out-Count
sheet" from his hearing officer right prior to the hearing, but
had that request denied.  See Docket Entry No. 1. at 9-10.

or from state or federal law.  See Hewitt v. Helms, 459 U.S. 460,
466 (1983); Asquith v. Dep't of Corr., 186 F.3d 407, 409 (3d Cir.
1999).  Where the government has created a right to good time
credits, and has recognized that a prisoner's misconduct
authorizes deprivation of the right to such credits as a
sanction, the prisoner is entitled to a hearing by an impartial
disciplinary tribunal, Wolff, 418 U.S. at 570-71, i.e., by an
officer excluding "only those [prison] officials who have a
direct personal or otherwise substantial involvement . . . in the
circumstances underlying the charge."  Meyers v. Alldredge, 492
F.2d 296, 306 (3d Cir. 1974).

In addition, within the setting of an administrative
hearing, the due process guarantees have two arms, one
"quasi-procedural" and the other "quasi-substantive."  Mitts v.
Zickefoose, 869 F. Supp. 2d 568, 575 (D.N.J. 2012).  To comply
with the quasi-procedural arm, prison officials must provide a
prisoner facing sanctions with: (1) a written notice of the
charges at least 24 hours prior to his hearing, (2) an
opportunity to call witnesses and presented documentary evidence
in his defense unless it is unduly hazardous to institutional
safety/correctional goals, and (3) a written statement as to the
evidence relied on and the reasons for the disciplinary action.
See Wolff, 418 U.S. at 564-66.

On its quasi-substantive side, the due process requires that

findings of a prison disciplinary official be supported by "some

evidence" in the record.  See Superintendent, Massachusetts

Correctional Institution at Wolpole v. Hill, 472 U.S. 445, 454-56

(1985).  Ascertaining whether the "some evidence" standard is

satisfied "does not require examination of the entire record,

independent assessment of the credibility of witnesses, or

weighing of the evidence."  Id. 455.  "Instead, the relevant

question is whether there is *any* evidence in the record that

could support the conclusion reached by the disciplinary board."

Id. at 455-56 (emphasis supplied).[5]

    C.    Analysis

        1.    Evidence Against Petitioner

Here, Petitioner's incident report supplied the required

---

[5]  Hence neither the "beyond a reasonable doubt" nor even
the "preponderance of evidence" standard is applicable to a
prison hearing.  See, e.g., Hairston v. Heffron, 2010 U.S. Dist.
LEXIS 134999, at *13 (D.N.J. Dec. 21, 2010) ("there is no
question that the 'some evidence' standard is less exacting than
the preponderance of the evidence standard: it merely requires
that the decision not be arbitrary or not without any support in
the record") (citing Gaither v. Anderson, 236 F.3d 817, 819 (7th
Cir. 2000); Brown v. Fauver, 819 F.2d 395 (3d Cir. 1987); Gibbs
v. King, 779 F.2d 1040, 1044 (5th Cir. 1986)).  However, the
"some evidence" requirement is violated if a disciplinary
sanction is rendered either (a) without any factual basis, or (b)
on the basis of facts that are shown to be wholly false.  Cf.
Williams v. Federal Bureau of Prisons, 85 F. App'x 299, 303 (3d
Cir. 2004) (noting, without endorsement, the holding of in Paine
v. Baker, 595 F.2d 197, 201 (4th Cir.1979), that "[i]n certain
limited circumstances a claim of constitutional magnitude is
raised where a prisoner alleges (1) that information is in his
file, (2) that the information is false, and (3) that it is
relied upon [by an administrative body] to a constitutionally
significant degree [and to the petitioner's detriment]").

"some evidence," and Petitioner's own admission that he had his
hands dipped into his pants, scratching his genital area in a
public place and in open view of the reporting officer, verified
the same.  Hence, the "some evidence" requirement is satisfied
here.

The key error in Petitioner's argument ensues from what
appears to be his belief that a prohibited sexual act must be
conducted for actual sexual gratification.  However, an inmate
committing the conduct prohibited by Code 205 must merely "engage
in *inappropriate sexual* behavior."  See
http://www.bop.gov/locations/institutions/eng/ENG_fdc_aohandbook.
pdf.  Hence, an inmate's persistent public touching, scratching,
or massaging of his genital area qualifies as both "sexual" and
"inappropriate," regardless of whether: (a) it is conducted for
the purposes of his sexual gratification; or (b) it is done to
satisfy other bodily needs, or to offend the staff, to entertain
other inmates, as a joke, or the like.  What matters is whether
the conduct could be *perceived* by a reasonable observer as sexual
and inappropriate.

As the Court of Appeals stressed: "[An inmate sanctioned
under Code 205 need] not [be] found to have engaged in a sexual
act; rather, he [should be] found to have engaged in activity
that could have been perceived as a sexual act and which was
disruptive to the orderly  running of the institution."

Pachtinger v. Grondolsky, 340 F. App'x 774, 776-77 (3d Cir.

2009). Hence, Petitioner's hearing officer correctly observed

that an inmate experiencing a need to persistently touch,

scratch, or massage his genital area shall conduct these acts in

privacy, e.g., in a restroom.

Because Petitioner concedes that he dipped his hands into

his pants and was persistently scratching his genital area, the

hearing officer's findings were supported by "some evidence".

This is so even if the Court were to presume that the reporting

officer somehow erred in her belief that Petitioner exposed his

penis while he kept "scratching" it.

2.    Impartiality of Hearing Officer

Petitioner also asserted that his hearing officer was

biased against him. However, the record provided by Petitioner

unambiguously indicates that his male hearing officer was a

person distinct and different from the female reporting officer.

Petitioner alleges nothing but his self-serving speculations and

displeasure with the outcome of his hearing.[6]

---

[6] Petitioner also asserted that his hearing officer had a
"conflict of interest" and should have recused himself because he
and the reporting officer were both part of the Fairton prison's
"Educational/Recreation Department [and are supervised by the
same] Supervisor of Education Ms. Sedewleski." Docket Entry No.
1, at 10. However, no due process guarantees prevent the hearing
officer from having common employ with the officer who executes
the incident report. Indeed, typically, both the hearing officer
and the officer executing the incident report are employed by the
same prison facility (and are supervised by the same warden), and
the distinction between an employ within the same facility and

Petitioner's position is unwarranted.  While a "fair trial

in a fair tribunal is a basic requirement of due process,"

Withrow v. Larkin, 421 U.S. 35, 46 (1975) (citations omitted), to

sustain a claim of [decision- maker's misconduct], there must be

an extremely high level of interference by the [decision-maker]

which creates a pervasive climate of partiality and unfairness."

Duckett v Godinez, 67 F.3d 734, 740 (9th Cir. 1995) (internal

quotations and citation omitted).  Thus, to obtain habeas corpus

relief on a challenge based on tribunal's misconduct, an inmate

must show *actual* bias, i.e., state the facts verifying that the

decision-maker treated him in a fashion showing unfairness per

se.  See Johnston v. Love, 940 F. Supp. 738, 754 (E.D. Pa. 1996),

aff'd, 118 F.3d 1576 (3rd Cir.), cert. denied, 522 U.S. 972

(1997).  In contrast, an inmate's mere impressions or deducements

cannot establish bias, just as they cannot establish a conflict

of interest.  See id.; see also Withrow, 421 U.S. at 47.

Furthermore, an adverse ruling, be it administrative or judicial,

is not sufficient for an inmate to make out a claim of the

decision-maker's bias.  See United States v. Gallagher, 576 F.2d

1028, 1039 (3d Cir. 1979).  Thus, Petitioner's challenges to the

_____

that within the same department is as immaterial as Petitioner's
speculations.  "[B]eliefs or opinions which merit recusal must
involve an extrajudicial factor." Selkridge v. United of Omaha
Life Ins. Co., 360 F.3d 155, 167 (3d Cir. 2004) (quotation marks
and citation omitted); accord Liteky v. United States, 510 U.S.
540, 555 (1994) (extensively detailing the same).

impartiality of his hearing officer are without merit.

### 3.   Notice of Charges

Petitioner concedes that he was served with a written notice
of the charges against him; moreover, he was served with it ten
days prior to his hearing, well in excess of the 24-hour period
required.  Thus, this requirement was satisfied.

In addition, there is no dispute that Petitioner was served
with a written statement as to the evidence relied upon by his
hearing officer and the officer's reasons for imposing
Petitioner's sanctions.[7]

### 4.   Opportunity to Call Witnesses

Finally, Petitioner's last allegation was that he was denied
an opportunity to call witnesses in his defense.  This allegation
is, in turn, two-pronged.  First, Petitioner maintains that he
should have been allowed to call Dr. Morales as his witness.
Second, Petitioner claims that: (a) the hearing officer violated
his rights by stating that he could not determine which inmates
Petitioner wished to call as his witnesses on the basis of
Petitioner's mere statement that those inmates were "Jamaican";

---

[7]  Petitioner asserted that his rights were violated because
he was served with the disciplinary officer's findings with a
delay.  However, there is no time-frame requirement for such
service.  Moreover, while Petitioner attempts to stitch his delay
allegations to his exhaustion efforts, his position is without
merit because he claims he exhausted his administrative remedies
all alleged delays regardless.  Moreover, this Court presumes,
without making a factual finding to that effect, that all
administrative remedies were duly exhausted.

(b) the hearing officer violated Petitioner's rights by failing

to investigate who these "Jamaican" inmates could have been; and

(c) the hearing officer violated his rights by (i) denying

Petitioner's request for the "30 Inmate Out-Count sheet" when

Petitioner might have requested it right prior to commencement of

his disciplinary hearing and by (ii) declining to postpone

Petitioner's disciplinary hearing when Petitioner elected to

hypothesize that he could have determine the surnames of these

"Jamaican" inmates from reading that "30 Inmate Out-Count sheet."

See generally, Docket Entry No. 1.

Both prongs of Petitioner's challenges are meritless on the

grounds detailed in Pachtinger. There, an officer reported that

she observed an inmate lying on his top bunk under the sheets

with his arms spread out, while his cellmate was too on the same

bunk, in a fetal position, with the cellmate's head situated near

the inmate's groin. See Pachtinger, 340 F. App'x at 776. "When

confronted, both men stated that they were just 'pranking.'" Id.

The inmate was charged with a violation of Code 205 and

sanctioned, inter alia, to disallowance of 27 days GCT credit.

See id. The inmate commenced a § 2241 action asserting

insufficiency of evidence and arguing that "he was denied the

right to present a witness (his cellmate)." Id. The district

court disagreed, and the Court of Appeals affirmed, pointing out

that the cellmate's testimony, even if offered, could not have

altered the outcome of the inmate's disciplinary hearing because:
(a) the hearing officer accepted the inmate's denial of engaging
in an actual "sexual act"; but (b) neither the inmate nor his
cellmate denied that the cellmate was, indeed, on the inmate's
bunk, in a fetal position, near the inmate's groin, "engag[ing]
in [an] activity that could have been perceived as a sexual act."
Id.

The facts at bar are analogous from those in Pachtinger,
especially as to Dr. Morales.  Petitioner's hearing officer
accepted Petitioner's contention that Petitioner had psoriasis,
including in his genital area.  Therefore, Dr. Morales'
testimony, if offered, could not have altered the outcome of
Petitioner's disciplinary hearing, that is, unless Petitioner was
hoping that Dr. Morales would, somehow, testify that he medically
advised Petitioner to indulge in persistent scratching his
genital area while in public places and in view of prison staff.[8]

Petitioner's allegations based on his inability to call the
three unidentified "Jamaican" inmates appear equally deficient.
While Petitioner was allowed to request calling the witnesses he
could identify, Petitioner's disciplinary officer had *no
obligation to search* for the "exculpatory evidence," including

---

[8]  Since it is self-evident that Dr. Morales could not have
offered such a testimony, Petitioner's challenges are facially
meritless.  Cf. Thornton v. Micrografx, 878 F. Supp. 931, 938
(N.D. Tex. 1995) ("The court refuses to leave its common sense at
the courthouse steps").

the identities of these witnesses.  Harris v. Shartle, 2013 U.S.

Dist. LEXIS 151657, at *9 (D.N.J. Oct. 18, 2013) ("Petitioner's

prison officials had no obligation to search for the 'exculpatory

evidence' which Petitioner hypothesizes might have been found

upon such a search").  It was Petitioner's obligation to provide

his prison officials with a witness description *unambiguous*

*enough* to allow them to locate these witnesses.  Compare Cannon

v. Schultz, 2010 U.S. Dist. LEXIS 59468, at *5 and n.2 (D.N.J.

June 16, 2010) (where a petitioner provided the prison officials

with both the prison "bed-bunk" number and surname of his

requested witness-inmate, but was unable to state the witness's

exact first name and prison identification number, and the

petitioner's prison officials' refused to call that witness on

the grounds that the task of locating him through the "bed-bunk"

number and surname was "unsurmountable," this Court found that

the petitioner's Wolff-based rights were violated).  Here, in

contrast, Petitioner's definition of his witnesses as "Jamaican"

was ambiguous.

   Third, Petitioner did not explain to this Court how his

examination of the "30 Inmate Out-Count sheet" could have enabled

him to locate his "Jamaican" witnesses.[9]  Moreover, Petitioner

---

   [9]   See http://www.my-island-jamaica.com/jamaican_surnames.
html (listing the following thirty surnames as the most popular
Jamaican surnames: "Allen, Anderson, Bailey, Brown, Campbell,
Clarke, Davis, Dixon, Francis, Gordon, Graham, Grant, Gray,
Green, Grey, Henry, Higgins, Jones, Lawrence, Lewis, Malcolm,

did not explain why did he come up with his request to examine

the "30 Inmate Out-Count sheet" right prior to commencement of

his hearing, even though he knew of the charges against him for

ten days.  Nor did he explain why he waived his right to obtain a

prison representative, since such representative could have

either provided him with the desired "30 Inmate Out-Count sheet"

or examined that list and surveyed the listed inmates.

Finally, and paramount, Petitioner did not explain how these

"Jamaican" witnesses, even if located, could have contributed to

his defense.  Indeed, since Petitioner was sanctioned not for

actually engaging in a sexual act but for engaging in conduct

that could have been "perceived as a sexual act," Pachtinger,

340 F. App'x at 776-77, the alleged witnesses' testimonies would

be of any value to Petitioner only had these inmates testified

that the entire process of Petitioner's dipping his hands into

his pants and scratching his genital area was such that no

reasonable observer could have perceived it to be inappropriate

sexual conduct detected by the reporting officer.[10]  Therefore,

the entirety of Petitioner's challenges based on denial of an

---

Miller, Morgan, Palmer, Powell, Robinson, Smith, Thompson,
Williams and Wright."  Even a cursory review of these surnames
indicates that they are just as common in all parts of the United
States, and throughout Britain, in Canada, Australia, etc.)

[10]   In addition, such statements of these three witnesses
might prove facially irreconcilable with Petitioner's own
statements.

16

opportunity to call these three "Jamaican" witnesses appear

meritless.  However, granted the lengthy and highly convoluted

nature of Petitioner's allegations as to this particular issue,

and the Court's inability to distill Petitioner's allegations

with absolute certainty, this Court – solely out of an abundance

of caution – finds it warranted to grant Petitioner a narrowly-

tailored leave to amend and clarify this particular challenge.[11]

IV.  CONCLUSION

For the foregoing reasons, Petitioner will be directed to

submit his filing fee or to complete an <u>in</u> <u>forma</u> <u>pauperis</u>

application.

The Clerk will be directed to administratively terminate

this matter.  <u>See</u> <u>Papotto v. Hartford Life & Accident Ins. Co.</u>,

---

[11]  Petitioner's voluminous submissions suggest his
impression that he might have his loss of GCT credits
conclusively invalidated by this Court.

> However, and contrary to what appears to be
> Petitioner's perception, even if a federal court
> determines that an inmate's due process rights were
> violated during an administrative hearing, the federal
> court does not conduct its own "trial" superceding a
> defective administrative proceeding: in such case, the
> proper remedy is a curative administrative hearing . .
> . . <u>See</u>, <u>e.g.</u>, <u>Mickens-Thomas v. Vaughn</u>, 355 F.3d 294
> (3d Cir. 2004); <u>Toolasprashad v. Grondolsky</u>, 570 F.
> Supp. 2d 610, 631 (D.N.J. 2008); <u>cf.</u> <u>Wilkinson v.
> Dotson</u>, 544 U.S. 74, 125 S. Ct. 1242, 161 L. Ed. 2d 253
> (2005); <u>Howard v. United States Bureau of Prisons</u>, 487
> F.3d 808 (10th Cir. 2007).

<u>Cannon</u>, 2010 U.S. Dist. LEXIS 59468, at *16-17.

2013 U.S. App. LEXIS 19660, at *26 (3d Cir. Sept. 26, 2013)
("administrative closings . . . are a practical tool used by
courts to prune overgrown dockets and are particularly useful in
circumstances in which a case, though not dead, is likely to
remain moribund") (citation, ellipses and internal quotation
marks omitted).

Petitioner will be allowed an opportunity to have this
matter reopened upon his filing of a written statement, detailing
clearly and concisely: (a) how Petitioner intended to
conclusively identify his prospective "Jamaican" witnesses from
the information contained in the "30 Inmate Out-Count sheet"; (b)
why he requested to review the "30 Inmate Out-Count sheet" right
prior to his hearing instead of at the time when he was informed
of the charges against him, and why he waived his right to
request a prison representative who could obtained for him the
"30 Inmate Out-Count sheet" or investigated its content and made
a follow-up survey of those listed; and (c) how these witnesses
might have offered testimonies that would be both reconcilable
with the statements Petitioner made to the hearing officer and,
in addition, showing that Petitioner did not engage in an
activity that could have been perceived by a reasonable observer
as a sexual act.[12]

---

[12]  All Respondents other than Petitioner's warden will be
dismissed.  See Padilla v. Rumsfeld, 542 U.S. 426, 442, 446-47
(2004) ("Whenever a § 2241 habeas petitioner seeks to challenge

18

An appropriate Order follows.

                                        s/Renée Marie Bumb
                                        **RENÉE MARIE BUMB**
                                        **United States District Judge**

Dated: January 8, 2014

---

his present physical custody within the United States, he should
name his warden as respondent"); <u>Yi v. Maugans</u>, 24 F.3d 500, 507
(3d Cir. 1994) (petition must be addressed to the warden because
"it is the warden that has day-to-day control over the prisoner
and who can produce the actual body" of the person detained).
<u>Accord</u> <u>supra</u> this Opinion, note 7 (an administrative exhaustion
aspect is of no relevance to the validity of an inmate's habeas
claim unless such claim is denied for failure to exhaust).